IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 9, 2013

**JEREMY YOUNG v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 0708677      W. Otis Higgs, Jr., Judge**

**No. W2012-01193-CCA-R3-PC  -  Filed July 22, 2013**

The Petitioner, Jeremy Young, appeals from the denial of his petition for post-conviction relief.  He contends (1) that his guilty plea to first-degree murder was not knowingly and voluntarily entered and (2) that he was denied the effective assistance of counsel because his trial attorneys allowed their hired agents to unduly influence him into pleading guilty, failed to seek a change of venue, and led him to believe that he could get his conviction overturned on post-conviction relief.  After consideration of the record and the applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

R. Todd Mosley, Memphis, Tennessee, for the appellant, Jeremy Young.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Dean Decandia, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

The record reflects that the Petitioner was indicted on November 22, 2007, for the following offenses: murder during the perpetration of a robbery; murder during the perpetration of a rape; first-degree murder; two counts of aggravated robbery (two victims); aggravated rape; and attempted first degree murder.  The record also reflects that the State had filed notice of its intent to seek the death penalty against the Petitioner.  In exchange for

the Petitioner's guilty plea to first-degree murder during the perpetration of a robbery, he was sentenced to life in prison without the possibility of parole, and the remaining seven counts in the indictment were dismissed.

The Petitioner filed a petition for post-conviction relief on February 24, 2010, and a hearing was held on February 2, 2012. Counsel was appointed, and two amended petitions were filed. The following issues presented in the petitions for post-conviction relief were raised at the hearing: (1) the Petitioner's pleas were not knowingly and voluntarily entered; and (2) the Petitioner's trial attorneys rendered ineffective assistance of counsel to the Petitioner in allowing their agents to unduly influence his decision to plead guilty, in failing to request a change of venue as requested, and in improperly leading the Petitioner to believe that he could get his conviction overturned on post-conviction appeal. The following evidence was presented in support of the Petitioner's allegations.

Glori Shettles, a mitigation specialist hired by the defense, testified that her duties in this case required her to evaluate the State's case in preparation for their mitigation presentation at sentencing. She explained that she felt strongly that the Petitioner should plead guilty but that the Petitioner insisted on going to trial. Because the Petitioner was close to his family, Ms. Shettles drafted and mailed them a letter to be sure that they were fully informed about the case. Ms. Shettles admitted that she was trying to convince the family members to have the Petitioner plead guilty. She explained that the mitigating proof was not very compelling and that she did not feel that they had enough information to make a jury feel empathetic. Ms. Shettles further explained that she spoke with an expert to testify on the Petitioner's behalf and that he would testify, but she did not feel it would be terribly effective. Ms. Shettles stated that, as a mitigation specialist, she was required to make a prediction and an assessment of what would happen at trial by weighing the State's evidence versus that of the defense and share that information with the Petitioner. She explained that if she did anything differently, she would not be doing her job. However, despite her best efforts, the Petitioner was still considering going to trial at the end of their conversation.

Ron Lax, the primary "guilt/innocence stage" investigator for the defense, testified that he met with the Petitioner several times during his investigation. He recalled relaying a story to the Petitioner about God and explained that he told the story because he wanted the Petitioner to understand that he was being given an opportunity to avoid death. He further explained that he knew the Petitioner believed in God and that he did his job convincing the Petitioner to take the best option, to plead guilty. Mr. Lax admitted that the Petitioner ultimately change his mind about going to trial but that he was unsure of the time frame.

Jacqueline Young, the Petitioner's mother, testified that she received Ms. Shettles's letter and was stunned because they were telling the Petitioner to "basically just plead guilty."

The Petitioner was adamant about going to trial, so she wanted to know why the attorneys did not want to "fight." Ms. Young stated that the family met with the Petitioner's attorneys who discussed why they did not believe he should go to trial. The attorneys asked them to talk to the Petitioner, explaining that "Memphis is prejudiced," that " jurors will say anything to get on a jury trial," and that they would "give him the death penalty." When she asked lead counsel about a change of venue, he said "Tipton County was just as prejudiced as Memphis. He said that it would be a high profile case, because . . . Bill Gibbons or somebody was running for some office so it would be an election year for him." Ms. Young stated that lead counsel also told her that "if he felt after everything was over that they didn't do what they were supposed to do, they would do whatever . . . they could to help him get back into court." After her last meeting with the attorneys, Ms. Young talked to the Petitioner that night and told him that he should plead guilty. Ms. Young testified that the Petitioner said that he could not plead guilty because he did not want to do it, and she told him that it was his decision and that the family would be with him. She stated that Ms. Shettles called her the next day and told her that the Petitioner pleaded guilty. When she asked what happened, Ms. Shettles told her about Mr. Lax and the biblical story that he shared with the Petitioner.

Co-counsel testified that he and lead counsel shared the responsibilities and that they were now working on their eighth capital case together. He stated that he does most of the legal reading, writing, and research and that they prepared for mitigation jointly. Co-counsel said that they hired investigators who worked at their direction and that the investigators submit reports to them for every interview they conduct, but neither he nor lead counsel "micro manage" their investigators. Co-counsel testified that he did not seek a change of venue because he did not think it would be granted, and that to date, a change of venue had never been granted in Memphis. Co-counsel explained that he had previously done research on the issue while working on another "death penalty case, in which [he] did extensive research on the history of change in venue in Tennessee, and it was clear that wasn't going to happen." Co-counsel further explained that while he was worried about the jury pool being infected due to the case's profile on "The First 48," because the show is broadcast nationwide, this would be an issue "anywhere in the country."

Co-counsel testified that after reviewing the evidence, he thought the Petitioner had a sixty percent chance of getting the death penalty. He stated that the Petitioner's initial outlook on the case was completely unrealistic because he did not want to do any time. Co-counsel also stated that Memphis had strong racist views hiding under the surface of every trial and that he had no doubt that once the jury heard the facts, the Petitioner would be convicted. He explained that even if the Petitioner did not receive death, he would receive life plus a number of years which would guarantee that he would never get out of prison. Co-counsel admitted that he encouraged the Petitioner to plead guilty but insisted that he did not force him to do so. He stated that the Petitioner may not have wanted to plead guilty, but he

did so because it was in his best interest; it was ultimately his decision.

On cross-examination, co-counsel admitted that the Jesse Dodson case, which was before the same judge as the Petitioner's case, was also profiled on First 48 and that a change of venue had subsequently been granted in that case, insofar as a jury was brought in from Nashville. However, he explained that the Dodson case arose after the guilty plea was entered in the instant case, and reiterated that at the time of the Petitioner's plea, a change of venue had not been granted in Memphis. Co-counsel stated that there was no precedent for such a request and asked, "even if we had a change of venue, where would we go?"

Lead counsel testified that he was one of the attorneys for the Petitioner and that he was lead counsel in the case. He stated that as lead counsel, he reviewed the evidence, spoke with the investigators, met with the prosecutors, and met with the Petitioner. The Petitioner told lead counsel that he wanted to go to trial. Lead counsel testified that the Petitioner did not seem to grasp the reality of the imposition of the death penalty until approximately two months before he pleaded guilty, around December 2008. It was around this time that the Petitioner began to entertain the idea of a settlement. Lead counsel explained that his initial plan was to get the Petitioner out of a conviction for first-degree murder because the Petitioner contended that the shooting was accidental. However, after reviewing the ballistics and investigation reports and speaking with ballistics experts, they "were told time and again that the [accidental shooting] defense was ludicrous." In fact, one of the experts told him "that there was no way in God's green earth that the shooting could have happened in the way that [the Petitioner] described." As such, he believed that pleading guilty was in the Petitioner's best interest. Lead counsel testified that he does not dispute that the Petitioner may have still wanted to take the case to trial as of February 13, 2009, six days prior to the day he ultimately pleaded guilty. However, lead counsel explained that the Petitioner was a teenager at the time and that, for a teenager, "the reality of a life sentence is enormous. It's overwhelming. And so, [the Petitioner] probably did believe erroneously[,] in [his] opinion, that there might be some way out of this life sentence. There was not." Regarding his conversation with the Petitioner about post-conviction matters, lead counsel stated, "I may have told him that if you think that we did something wrong, raise it in a petition for post-conviction, but for the time being, let's save your life."

On cross-examination, lead counsel testified that he had been practicing criminal defense for fifteen years and that he had handled thousands of criminal cases. He explained that, in his experience, many clients "hold out," believing that a better offer will be given on the trial date. Lead counsel admitted that the Petitioner gave a very damaging statement to the police, which he stuck to throughout the course of lead counsel's representation, in which the Petitioner admitted the following: that he planned a robbery of the two victims; that he participated in the robbery at gunpoint; that things were taken at gunpoint; that he took the

-4-

female victim into another room at gunpoint; that he took pills from her in that room; and that he shot her in the head in that room. Although the Petitioner claimed that the shooting was an accident, a defense that lead counsel intended to use at trial, the autopsy showed a contact wound to the temple, which is consistent with an execution. The Petitioner also admitted in that statement that he tried to shoot the victim's husband but that the gun jammed when he attempted to do so. Lead counsel admitted that the investigation report also showed that the victim's clothes were pulled down and that there was semen found in the victim's mouth which matched the Petitioner. As a defense to the alleged rape, the Petitioner said that he and the victim had engaged in a consensual sexual encounter earlier that day. Nevertheless, lead counsel admitted that even if the jury had accepted the Petitioner's version of the events as true, there was no defense to the two counts of aggravated robbery. Therefore, there was no defense to the murder during the perpetration of a robbery, and if he was convicted of the first degree murder, the jury would consider the death penalty. Further, there was also no defense to the attempted murder of the victim's husband. Lead counsel attempted to get the Petitioner the most lenient sentence possible, but despite lead counsel's attempts, the prosecutors would not offer anything less than life without the possibility of parole and that offer was not made until very close to trial.

The Petitioner testified that he felt forced to plead guilty. The Petitioner explained, "Before I pled guilty, me and my lawyers we talked about lesser included offenses, about the possibility of . . . getting a leniency [sic] sentence." The Petitioner stated, "he told me he was going to save my life. And he asked me what do I think he meant by that? I said get me back out there to my little girl as soon as possible." The Petitioner said that lead counsel "said he would do the best he could." According to the Petitioner, his attorneys talked about lesser-included offenses all the way up to trial, and when the trial date arrived, they said there was no need to go to trial, that the jury would not believe his story, and that the State would convict and "kill [him]." The Petitioner stated that he changed his mind about going to trial after listening to his family, the private investigators, and his attorneys. He said that he was concerned about a fair trial because his case was profiled on "The First 48." The Petitioner asked lead counsel for a change of venue, meaning a different county; however, lead counsel told him that there was no need for a change of venue and that the State would not approve it. The Petitioner also stated that neither of his attorneys discussed his appellate rights with him, but lead counsel did say that "he would do anything he could to help [him] in the post-conviction." The Petitioner said he believed that to "[m]ean that if [he] pleaded guilty that he was going to help [him]" by "getting [him] back in court."

The Petitioner testified that he still wanted to go to trial after speaking with Ms. Shettles, approximately a month before trial, about the weight of the State's evidence against him. However, the Petitioner stated that his decision changed after he spoke with his mother and Mr. Lax. Specifically, he stated that during his conversation with his mother, which was

very compelling, she told him that she had talked to his attorneys and that, from what his mother was relaying, he believed that "they basically gave up on [him], they weren't going to fight for [him]." The Petitioner no longer believed that his attorneys were acting in his best interest. The same day he pleaded guilty, Mr. Lax spoke with him and told him a biblical story. The Petitioner said that he believed God was speaking to him through Mr. Lax and that God was telling him to make a wise decision but not necessarily to plead guilty. He stated that it was everything combined that led him to plead guilty. While he admitted that he told the judge at his plea hearing that he was entering his plea voluntarily, without influence from other people, the Petitioner said that he would not have pleaded guilty had he not spoken to his mother. The Petitioner also said that if Mr. Lax had not told him that story, he believed that he would have had more time to make a decision, and he also believed that he would have had more faith in counsels' representation of him if they had requested a change in venue. The Petitioner stated that he thought that lead counsel's statement about post-conviction meant that he could get his conviction overturned.

On cross-examination, the Petitioner admitted that if convicted, consecutive sentencing could have been imposed. He agreed that pleading to life without the possibility of parole allowed him to see his little girl and that this was a factor in his decision to plead guilty. The Petitioner admitted that he spoke to his mother the night before he talked to Mr. Lax and that he left that discussion still wanting to go to trial. He also admitted that the decision to go to trial was mainly because of his faith; he believed it was God's intention for him to plead guilty and that it was a wise decision.

On redirect, the Petitioner stated that he was thinking about pleading guilty after his conversation with Mr. Lax, subsequent to his conversation with his mother, and that his belief that God was speaking to him through Mr. Lax influenced him to plead guilty.

The post-conviction court denied the Petitioner's request for relief via order on May 9, 2012. The post-conviction court found that the Petitioner's plea was, in fact, knowingly and voluntarily entered, and that he had failed to show by clear and convincing evidence that he was denied the effective assistance of counsel as required by law.

This appeal followed.

ANALYSIS

On appeal, the Petitioner contends that (1) his plea was not knowingly and voluntarily entered and (2) that he did not receive the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions, specifically, because his trial attorneys, along

-6-

with their agents, unduly influenced him to plead guilty, that his attorneys failed to seek a change of venue, and that his attorneys improperly led him to believe that he could get his conviction overturned on post-conviction. The State responds that the transcript of the guilty plea hearing reflects that the Petitioner's plea was knowingly and voluntarily entered. Further, there is no proof in the record to support the Petitioner's allegations that his trial attorneys or their agents forced or manipulated him into pleading guilty, to explain what impact the case's coverage on "The First 48" had on the potential jury pool, nor to show that he would have gone to trial if his attorneys had sought a change of venue. We agree with the State.

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

*I. Voluntariness of Plea*

The Petitioner generally contends that his plea was not voluntary because he was unduly influenced by his trial attorneys and their agents to plead guilty and that the trial court should have addressed him directly regarding the voluntariness of his plea at the guilty plea hearing.

When analyzing the voluntariness of a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State

v. Mackey, 553 S .W.2d 337 (Tenn. 1977). See State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, our supreme court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea. Pettus, 986 S.W.2d at 542. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). In order to find that the plea was entered "intelligently" or "knowingly," Boykin requires that the trial court "canvass[ ] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequences." Blankenship, 858 S.W.2d at 904 (quoting Boykin, 395 U.S. at 244)(emphasis in original). Explicit statements are not required. See generally Blankenship, 858 S.W.2d at 903-04 ("Although the Tennessee cases have tended to focus rather narrowly on whether an accused was advised explicitly of his right to trial by jury, his right against self-incrimination, and his right to confrontation, it is clear under federal law 'that Boykin does not require separate enumeration of each right waived and separate waivers as to each [of the three rights].'")(internal citations omitted).

The courts have recognized that "the decision to plead guilty is often heavily influenced by the defendant's appraisal of the prosecution's case against him and the likelihood of securing leniency through a plea bargain." See id. at 904. (quoting Brown v. Perini, 718 F.2d 784, 786 (6th Cir. 1983)). It was likely that this sort of "influence" was involved in the Petitioner's decision to plead guilty. However, "the mere existence of such an inducement to plead guilty does not constitute grounds for invalidating [the Petitioner's] pleas." Blankenship, 858 S.W.2d at 904. Instead, there are a number of circumstantial factors that should be considered when examining the voluntariness of a guilty plea. Id. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

Considering those factors, the transcript of the guilty plea hearing reveals that the trial court informed the Petitioner of the constitutional and specific trial rights he was waiving by pleading guilty, the charges against him, and the sentence to be imposed. The Petitioner agreed that his attorneys had discussed the issues, discovery, and plea agreement with him; that he fully understood its terms and the constitutional rights he was waiving by entering his plea; that no one made him or, otherwise, pressured him to plead guilty; and that he had no complaints about his attorneys' representation. After the plea colloquy, the trial court found that the Petitioner understood the process and that his plea was freely and voluntarily entered, without any threats or coercion. Upon entry of the plea, the Petitioner was sentenced to life

without the possibility of parole, and the remaining counts in the indictment were dropped. The record reflects that the Petitioner faced the death penalty and, even if he avoided the death penalty, could have been sentenced to a term much longer than life without parole; thus, by entering the plea, he avoided a potentially greater penalty in a jury trial. Additionally, at the post-conviction hearing, the Petitioner admitted that his desire to be released one day so he could see his daughter played a role in his decision to plead guilty. The post-conviction court found that the Petitioner's allegation that "his conviction was based upon an invalid[,] involuntary guilty plea [was] not supported by the record and d[id] not make a valid attack on the constitutionality of his guilty plea such to merit Post-Conviction Relief." We agree, and it is for these reasons we conclude that the Petitioner is not entitled to relief on this issue.

*II. Ineffective Assistance of Counsel*

Specifically, the Petitioner contends that he received the ineffective assistance of counsel because trial counsels, via their agents, unduly influenced him to plead guilty, because trial counsels failed to request a change of venue, and because his attorneys improperly led him to believe that he could get his conviction overturned on post-conviction.

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the defendant to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance was deficient is not enough; rather, the defendant must also show that but for counsel's deficient performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a defendant raising a claim of ineffectiveness

to show that counsel's representation was deficient, thus fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a defendant to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

*A. Coercion By Trial Counsels via Agents*

Once a guilty plea has been entered, claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. Hill v. Lockhart, 474 U.S. at 56 (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). The law is well-settled that "a guilty plea is not rendered involuntary by the fact that the accused is faced with an election between a possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea." Bratton v. State, 477 S.W.2d 754, 757 (Tenn. Crim. App. 1971); see Parham v. State, 885 S.W.2d 375, 381 (Tenn. Crim. App. 1994); Alford, 400 U.S. at 31; Hicks v. State, 983 S.W.2d 240, 248 (Tenn. Crim. App. 1998); Michael E. Christian v. State of Tennessee, No. E2000-00922-CCA-R3-PC, 2001 WL 55686 at *11 (Tenn. Crim. App. Jan. 24, 2001).

-10-

If the accused is to make "a voluntary and intelligent choice among the alternative courses of action" available to him, counsel must advise the accused, among other things, of the choices that are available to him as well as the probable outcome of these choices. If counsel is convinced that the accused should accept a plea bargain agreement and plead guilty, counsel should recommend that the accused opt for this choice. Counsel may use reasonable persuasion when making the recommendation.

Parham, 885 S.W.2d at 384. If counsel is convinced that the accused should accept a plea agreement and plead guilty, counsel should recommend that the defendant do so. Id. "Counsel may use reasonable persuasion when making the recommendation." Id. In the instant case, lead counsel testified that his goal was to save the Petitioner's life. Counsel explained that the Petitioner had an unrealistic view of the outcome of the case and that he did not begin to grasp the reality of the imposition of the death penalty until two months prior to his plea. Lead counsel stated that the Petitioner gave a damaging statement to the police, that the Petitioner never disputed, in which he admitted many of the crimes for which he was charged, leaving no defense as to the following indicted offenses: the two robberies; the attempted murder; and the murder in perpetration of a robbery. Also, co-counsel testified that he believed that the Petitioner had a sixty percent chance of getting the death penalty; that he had no doubt that the Petitioner would be convicted once the jury heard the facts; and that even if the Petitioner did not receive death, he would have received life plus a number of years which would guarantee that he would never get out of prison. Both attorneys stated that they believed entering a plea was in the Petitioner's best interest. At the post-conviction hearing, in evaluating the alleged conduct from counsel's perspective at the time, the post-conviction court found that counsels' performance fell "within the wide range of reasonable professional assistance" and that the Petitioner "fail[ed] to put forth or prove any specific actions or inactions constituting ineffective assistance of counsel or their prejudicial effect." The post-conviction court concluded that counsels' performance was "neither deficient, nor prejudicial." We agree with the post-conviction court and conclude that the Petitioner has failed to show that the actions of his attorneys unduly influenced him to plead guilty insofar as violating his right to effective assistance of counsel.

*B. Change of Venue*

The Petitioner contends that his trial attorneys were ineffective for failing to seek a change of venue because the facts of his case were featured on an episode of a crime show entitled "The First 48." Although this issue was properly raised at the hearing, the post-conviction court did not specifically address this allegation of ineffective assistance of counsel. Nevertheless, despite the limited argument and lack of cited authority on the issue, we will address it here.

A change of venue may be granted when it appears that because of "undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). A change of venue is not warranted merely because jurors have been exposed to pretrial publicity. State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997). Jurors "can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury." State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001). As this issue relates to a claim of ineffective assistance of counsel, the Petitioner must show that counsel was deficient for failing to request a change of venue and that, but for this deficiency, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.

In the instant case, co-counsel testified that he did not seek a change of venue because he did not think it would be granted, and, to date, a change of venue had never been granted in Memphis. Co-counsel explained that he had previously done research on the issue while working on another "death penalty case, in which [he] did extensive research on the history of change in venue in Tennessee, and it was clear that wasn't going to happen." Co-counsel further explained that although he was worried about the jury pool being infected due to the case's profile on "The First 48," because the show was broadcasted nationwide, this would have been an issue "anywhere in the country." While the lack of precedent in a change of venue being granted is not a sufficient reason to forego seeking a change of venue in a case where such is merited, we cannot conclude that the decision not to seek a change of venue was below the standard of representation demanded of attorneys in criminal cases. It is not even clear that a change of venue would have alleviated the Petitioner's concerns because, as noted by trial counsel, "The First 48" was broadcasted nationwide. We also note that, although the Petitioner argues that his counsel was ineffective for failing to request a change of venue, he makes no argument that this effected the voluntariness of his plea nor that he would have insisted on going to trial had counsel sought the change of venue. He only states that if counsels' had done so, he would have had more faith in them; that is not sufficient. Thus, we conclude that the Petitioner has failed to meet his burden of showing that counsels' decision not to request a change of venue improperly induced him to plead guilty, resulting in prejudice.

*C. Improperly Led to Believe that Conviction Would Be Overturned on Post-Conviction*

Despite the Petitioner's statements and testimony that his attorneys improperly led him to believe that he could get his conviction overturned on post-conviction, he makes no argument that this alleged statement unlawfully induced him to plead guilty or that had counsel not made such statement, he would not have pleaded guilty. Further, the record does not support the allegation that counsel ever made such a statement. The record reflects that lead counsel may have told the Petitioner that if he believed counsel did something wrong,

-12-

he could take it up on post-conviction; there is nothing in the record that contradicts lead counsel's testimony. The Petitioner stated that he interpreted lead counsel's statement about post-conviction to mean that lead counsel would get him back in court, but he never testified that lead counsel, in fact, told him that. Therefore, we conclude that the Petitioner has not presented sufficient evidence to support his allegations and post-conviction relief is not warranted.

<u>CONCLUSION</u>

Based on our review of the record and the applicable law, we affirm the judgment of the post-conviction court denying relief.

_____
D. KELLY THOMAS, JR., JUDGE